```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
GERALDINE ZAMIEROWSKI, Individually,    :
and as the Administratrix of the Estate         ECF CASE
of MICHAEL ZAMIEROWSKI, Deceased,       :
                                                05 Civ. 9309 (WCC)
                Plaintiffs,             :

        - against -                     :       OPINION
                                                AND ORDER
NATIONAL RAILROAD PASSENGER CORPORATION :
d/b/a AMTRAK, METRO-NORTH COMMUTER
RAILROAD a/k/a MTA METRO-NORTH RAILROAD :
a/k/a METRO RAILROAD, CONSOLIDATED
RAILROAD CORPORATION d/b/a CONRAIL and  :
PIRATE CANOE CLUB, INC.,

                                        :
                Defendants.
- - - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

        GEOGHAN, COHEN & BONGIORNO, LLC
        **Attorneys for Plaintiffs**
        1250 Broadway, Suite 3701
        New York, New York 10001

SAMANTHA A. TIENE, ESQ.

    Of Counsel to:    LEVINE & LEVINE
                          55 Market Street
                          Poughkeepsie, New York 12601

        LANDMAN CORSI BALLAINE & FORD PC
        **Attorneys for Defendants National**
         **Railroad Passenger Corporation**
         **d/b/a Amtrak, Metro-North Commuter**
         **Railroad a/k/a MTA Metro-North**
         **Railroad a/k/a Metro Railroad and**
         **Consolidated Railroad Corporation**
         **d/b/a Conrail**
        120 Broadway, 27th Floor
        New York, New York 10271

JAMES L. FERRARA, ESQ.

    Of Counsel

**A P P E A R A N C E S :  (continued)**

                                          SANABRIA & MANSON
                                          **Attorneys for Defendant**
                                           **Pirate Canoe Club, Inc.**
                                          90 Crystal Run Road, Suite 405
                                          Middletown, New York 10940

CHRISTINA M. SANABRIA, ESQ.

      Of Counsel

**CONNER, Senior D.J.:**

This action arises out of the death of Michael Zamierowski ("Zamierowski" or "decedent"), who was killed on December 17, 2004 when a northbound Amtrak train traveling approximately 85 to 95 miles per hour struck his Ford box truck. At the time of the accident, Zamierowski was attempting to pass through an unsignaled, ungated private railway crossing (the "Pirate Canoe Club Crossing" or the "Crossing") en route to defendant Pirate Canoe Club, Inc. ("PCC").

On September 9, 2005, plaintiff Geraldine Zamierowski, decedent's widow, filed an action in state court for negligence, wrongful death and loss of services against defendants National Railroad Passenger Corporation ("Amtrak"), Metro-North Commuter Railroad ("Metro-North"), Consolidated Railroad Corporation ("Conrail") (collectively, the "railroad defendants") and PCC (collectively, "defendants"). In their Amended Answer, the railroad defendants asserted cross-claims against PCC for common law and contractual indemnification. The railroad defendants then removed the action to the United States District Court for the Southern District of New York, where it was assigned to this Court.[1]

Presently before the Court is PCC's motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) or, in the alternative, for summary judgment pursuant to FED. R. CIV. P. 56, seeking dismissal of the railroad defendants' cross-claims. Specifically, PCC contends, with reference to the contractual indemnification cross-claim, that: (1) the railroad defendants materially breached the

---

[1] Amtrak was created by an Act of Congress, 49 U.S.C. § 24101, *et seq.*, thereby rendering removal proper pursuant to 28 U.S.C. §§ 1331 and 1349.

1

contract; and (2) the contract's indemnification clause is void as a matter of public policy. For the reasons stated herein, PCC's motion is granted in part and denied in part, though based on different reasoning.

**BACKGROUND**

On November 13, 2002, the New York State Department of Transportation ("NYDOT") informed PCC that the results of a recent railway crossing safety study prompted the agency to recommend that Metro-North install signal lights and gates at the private railway crossing known as the Pirate Canoe Club Crossing. (Sullivan Decl. ¶ 3 & Ex. A.) According to the NYDOT, it was willing to fund the estimated $200,000 installation under the condition that, in relevant part, PCC pay for annual inspection and maintenance costs associated with the equipment. (*Id.*) PCC responded that, while it did not object to Metro-North installing such equipment, it did object to Metro-North doing so on PCC property. (Ferrara Decl., Ex. B.) PCC also refused to pay any maintenance or inspection costs. (*Id.*) PCC contended that the railroad received a permanent easement—reserving to the grantor a right-of-access—from the property's original owner in 1858. (Sullivan Decl. ¶ 6 & Ex. D.) Accordingly, since PCC neither owned nor operated the Crossing, it did not feel it should bear any expense relating to the safety equipment. (*Id.* ¶ 4.) A series of letters among NYDOT, Metro-North and PCC contesting ownership of the Crossing and arguing about payment allocation followed. (*Id.*, Exs. C-F; Ferrara Decl., Ex. C.)

On January 22, 2004, Metro-North sent a draft agreement to PCC under which Metro-North agreed to maintain the Crossing safety equipment. (Sullivan Decl. ¶¶ 7-8 & Ex. F; Ferrara Decl., Ex. D.) Although Metro-North agreed to absorb the maintenance costs, the railroad defendants believed

that installation was contingent upon receiving the NYDOT funds. (Defs. Mem. Opp. Mot. Dismiss at 6; Hom Decl. ¶ 3.) As early as December 1, 2003, Metro-North's Assistant Director of Administration sent a letter to the NYDOT Regional Director enclosing a cost estimate of $257,825 for the project. (Ferrara Decl., Ex. L.) LeRoi Armstead, an NYDOT Senior Transportation Analyst, responded via letter on January 6, 2004, indicating the NYDOT had begun its project initiation process. (*Id.*, Ex. M.)

Metro-North and PCC, after a series of revisions, fully executed a final contract on March 2, 2004 (the "Agreement"). (Sullivan Decl. ¶ 10; Ferrara Decl., Ex. L.) The terms of the Agreement were effective retroactive to January 1, 2004 and were to run through December 31, 2023. (Sanabria Decl., Ex. 1 at ¶ 10.) According to the Agreement, its stated purpose is "to establish the terms and conditions pursuant to which Metro-North will maintain the Crossing." (*Id.*, Ex. 1 at 2.) PCC was obligated to obtain insurance for a number of railroad entities under the following Agreement provision:

> 3.    Insurance
>
> (a) The labor performed by Metro-North employees in connection with the initial installation of the Equipment as well as future maintenance and renewals performed in accordance with this agreement will be included within Metro-North's force account insurance program. The force account insurance provided will be in the amount of Two Million Dollars ($2,000,000.00) for any one occurrence of bodily injury and/or physical damage. PCC will be notified in the event of any material change in the coverage.
>
> (b) PCC shall maintain insurance providing for a total limit of not less than Two Million Dollars ($2,000,000.00) for all damages arising out of bodily injury to or death of all persons in any one accident or occurrence, and for all damages arising out of injury to or destruction of property in any one accident or occurrence and, subject to that limit per accident, a total (or aggregate) limit of Two Million Dollars ($2,000,000.00) for all damages arising out of bodily injury to or death of all persons in any and all accidents or occurrences and out of injury to or

destruction of property during the policy period. Metro-North, MTA, National Railroad Passenger Corp. ("Amtrak"), American Premier Underwriters, Inc. and its affiliates and subsidiaries ("APU"), The Connecticut Department of Transportation ("CDOT"), Consolidated Rail Corporation ("CRC"), CSX Transportation Inc. and New York Central Lines LLC ("CSX"), and Delaware & Hudson Railway Company, Inc. ("D&H") shall be named as additional insured parties for this coverage. Each insurance policy shall state that the insurance company(ies) shall agree to investigate and defend the insured against all claims or damages, even if groundless.

(*Id.*, Ex. 1 at ¶ 3.) In addition, the Agreement includes an indemnification provision, which reads:

> 4. Indemnification. PCC shall indemnify, defend, protect and save harmless Metro-North, MTA, Amtrak, APU, CDOT, CRC, CSX and D&H from and against all cost or expense resulting from any and all losses, damages, suits, claims and demands which Metro-North, MTA, Amtrak, APU, CDOT, CRC, CSX or D&H may directly or indirectly suffer, sustain or be subjected to by reason of the construction, existence, maintenance, repair, alteration, relocation or removal of the Crossing and related facilities, whether such losses and damages be suffered or sustained by Metro-North, MTA, Amtrak, APU, CDOT, CRC, CSX, D&H, licensees, or other persons or corporations, or by its employees, patrons, directly, or by its employees, patrons, licensees, or users of the Crossing who may seek to hold Metro-North, MTA, Amtrak, APU, CDOT, CRC, CSX or D&H liable to the extent such losses, damages, suits, claims and demands exceed PCC's insurance coverages under the policies PCC is required to maintain pursuant to Article 3(b) of this agreement, except for gross negligence or willful misconduct of Metro-North, MTA, Amtrak, APU, CDOT, CRC, CSX or D&H. If a claim or action is made or brought against either party hereto for which the other party may be responsible hereunder, in whole or in part, such other party shall be notified and permitted to participate in the handling or defense of all such matters. Each party shall hold harmless the other for any and all costs incurred due to the delay of that party to provide notice in a timely manner under this paragraph.

(*Id.*, Ex. 1 at ¶ 4.)

Four months after the Agreement was signed, Metro-North's Engineering Specification and Standard Officer, James Hom, sent an email to Armstead requesting a status update. (Ferrara Decl., Ex. N.) The following day Armstead replied that he did "not know what the hangup" was, but had

4

informed his boss of the lengthy delay. (*Id.*, Ex. O.) At a meeting several weeks later, the two men discussed the funding delay, with Armstead stating he would check on the status and inform Hom of the progress. (*Id.*, Ex. P.) Apparently having received no news from Armstead, Hom emailed Armstead on October 14, 2004 indicating that Hom was "getting all sorts of pressures from different [Metro-North] internal [departments] who would like to get this project going." (*Id.*, Ex. Q.) This prompted a phone call from Armstead to Hom in which Armstead stated he would continue to check on the funding status. (Hom Decl. ¶ 8.)

On December 17, 2004, while traveling through the still ungated, unsignaled Crossing on the way to PCC, the Ford box truck Zamierowski was operating was struck by a northbound Amtrak train traveling approximately 85 to 95 miles per hour, killing him instantly. (Tiene Decl., Ex. A.) According to the train's electronic event log, Amtrak Train #49 sounded its horn as it approached the Crossing, and, after striking decedent's vehicle, applied the brakes and came to a stop some 3,000 feet from the point of impact. (*Id.*) An investigation of the scene revealed a number of beer cans among the vehicle wreckage, and the autopsy/toxicology report revealed a blood alcohol content of .129% as well as the presence of marijuana in the decedent's system. (*Id.*)

The NYDOT finally approved $350,000 in funding for the Crossing project on January 4, 2005. However, Armstead informed Metro-North's Planning Department by letter that it would take up to six months for the NYDOT to actually transfer the funds. (Ferrara Decl., Ex. R.) Metro-North in fact received the funds some six months later, at which point it was required to supply the NYDOT with drawings of the proposed installation. (*Id.*, Ex. T; Hom Decl. ¶ 11.) It then took the NYDOT a month to respond with comments on Metro-North's proposed plan. (Ferrara Decl., Ex. U.) Pursuant to the instructions contained in a letter dated August 8, 2005 from the NYDOT Grade

5

Crossing Project Acting Director, Metro-North was to incorporate those suggestions into its plan and resubmit it. (*Id.*) Metro-North revised its plan accordingly and resubmitted it just four days later. (*Id.*, Ex. V.) The NYDOT did not approve the plan until November 2, 2005. (*Id.*, Ex. W.) Metro-North revised its plan once more on November 29, 2005, with the NYDOT approving the revision on December 15, 2005, nearly one year after Zamierowski was killed. (*Id.*, Exs. X-Y.) The project materials were delivered in December 2005, and Metro-North estimated that the installation would be completed by March 2006.[2] (Railroad Defs. Rule 56.1 Stmt. ¶ 37; Hom Decl. ¶ 12.)

## DISCUSSION

### I. Standard of Review

A party may move for judgment on the pleadings after the pleadings are closed but within such time as not to delay the trial. *See* FED. R. CIV. P. 12(c). The governing standard for a grant of judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) is identical to the standard applied when considering a motion to dismiss under FED. R. CIV. P. 12(b)(6) for failure to state a claim. *See King v. Am. Airlines, Inc.*, 284 F.3d 352, 356 (2d Cir. 2002) (quoting *Burnette v. Carothers*, 192 F.3d 52, 56 (2d Cir. 1999)). "In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). A complaint should not be dismissed under Rule 12(c) unless it appears that the plaintiff "cannot state any set of facts that would entitle him to relief." *Id.* Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions

---

[2] The parties had not informed the Court, at the time this Opinion & Order was issued, whether the project had been completed on schedule.

will not suffice to prevent" dismissal under Rule 12(c). *See* 2 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed. 1997). In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference. *See* FED. R. CIV. P. 10(c); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996).

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

II. **Analysis**

    A. **Contractual Indemnification**

PCC contends the railroad defendants materially breached the Agreement's mandate that they

"act diligently and without delay" in installing the active warning devices. (PCC Def. Mem. Supp. Mot. Dismiss at 4.) Alternatively, PCC asserts that the railroad defendants are not entitled to contractual indemnification because New York General Obligations Law § 5-322.1 does not permit a party to receive indemnification for its own negligence. (*Id.* at 5.) The railroad defendants counter that they did not breach the Agreement because the parties were aware that performance under the Agreement was contingent upon receipt of NYDOT approval and funds. (Railroad Defs. Mem. Opp. Mot. Dismiss at 11-12.) According to the railroad defendants, the Agreement was silent as to "when the work at the Crossing must be complete" or if the Agreement "would terminate if the work was not started or completed by a specific date." (*Id.* at 12.) According to the railroad defendants, "[t]he Agreement does not specify, or even imply, that the start or the completion of the upgrade work at the Crossing by Metro-North is a condition precedent to PCC's obligation to insure, defend and indemnify the railroad defendants." (*Id.*) In addition, the railroad defendants contend that the indemnification clause is not void because 49 U.S.C. § 28103(b) preempts New York General Obligations Law § 5-322.1. (*Id.* at 14-21.)

Under New York law, where "'a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.'" *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (quoting *Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005)). "Contracts must be read as a whole, and if possible, courts must interpret them to effect the general purpose of the contract." *Postlewaite*, 411 F.3d at 67. "The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent . . . . The best evidence of what parties to a written agreement intend is what they say in their writing." *Id.* at 69 (internal quotations

8

omitted). "'However, when the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.'" *LaSalle Bank*, 424 F.3d at 205 (quoting *Postlewaite*, 411 F.3d at 67).

Examining the express language of the entire Agreement, it is clear to the Court that the Agreement is strictly a maintenance contract. The Whereas clauses clearly indicate as much. The first Whereas clause reads, in relevant part: "Metro-North *is installing* automatic electric crossing gates with flashing lights and bells (the "Equipment") at PCC's existing private grade crossing . . . ." (Sanabria Decl., Ex. 1 at 1 (emphasis added).) The second Whereas clause codifies Metro-North's consent to maintain the Equipment "pursuant to the terms as set forth" in the Agreement. (*Id.*) Lastly, as noted above, the final Whereas clause expressly states that "it is the purpose of this agreement to establish the terms and conditions pursuant to which Metro-North will *maintain* the Crossing, including the Equipment." (*Id.*, Ex. 1 at 2 (emphasis added).) The Court is cognizant that the precepts of contract interpretation hold that general, preliminary clauses should not be placed above specific contractual provisions. *Permatex, Inc. v. Loctite Corp.*, No. 03 Civ. 943, 2003 WL 22683341, at *9 (S.D.N.Y. Nov. 14, 2003) (collecting cases). Rather, such clauses are merely useful interpretational aids. *Id.* These introductory recitations reveal an underlying assumption that installation of active warning devices will occur, and focus the purpose of the Agreement on the details of its maintenance. We find no conflict between these preliminary statements and the Agreement's specific provisions.

Under the first section of the Agreement, entitled "Services to be Provided at the Crossing," Metro-North agreed to "maintain . . . the Crossing, together with the Equipment." (Sanabria Decl., Ex. 1 at 2, ¶ 1(a).) That section also grants Metro-North the right to arrange for flagmen, watchmen,

9

inspectors and/or communication and signal services where its considers it necessary "during the work of maintaining the Crossing." (*Id.*, Ex. 1 at 2, ¶ 1(b).) This section makes no mention of rights or responsibilities for installation of the Equipment. The only other provision in the Agreement relating to service work concerns a "normal crossing renewal program," during which the railroad ties and rails are serviced. (*Id.*, Ex. 1 at 2, ¶ 2.) That section provides that Metro-North will "give reasonable notice to PCC . . . together with an estimated completion date for such renewal program" and allocates the cost of such work to Metro-North. (*Id.*)

Further evidence of the restricted scope of the Agreement is seen in the insurance provision, which is divided into subparts, the first relating to Metro-North's insurance responsibilities and the second to PCC's. The first subpart allocates "[t]he labor performed by Metro-North employees in connection with the initial installation of the Equipment as well as future maintenance and renewals" to Metro-North's force account insurance program. (*Id.*, Ex. 1 at 3, ¶ 3(a).) PCC is responsible for obtaining insurance for the railroad defendants, among others, for personal injury and property damage claims. This division of insurance responsibilities reflects the parties' intent that, although the Agreement was concluded prior to installation, PCC would not be responsible until installation occurred.

The indemnification provision of the Agreement evinces a similar understanding. Pursuant to that clause, PCC agreed to indemnify the railroad defendants, among others, for loss suffered "by reason of the construction, existence, maintenance, repair, alteration, relocation or removal of the Crossing and related facilities." (*Id.*, Ex. 1 at 4, ¶ 4.) The unambiguous language indicates that installation of the active warning devices was a condition precedent to PCC indemnifying the railroad defendants. *See Guerini Stone Co. v. P.J. Carlin Constr. Co.*, 248 U.S. 334, 340 (1919)

("[A] contract for the construction of a building, even in the absence of an express stipulation upon the subject implies as an essential condition that a site shall be furnished . . . ."). In a preemptive challenge to construing installation as a condition precedent, the railroad defendants state that "the Agreement language specifies that PCC would indemnify the railroad defendants for all losses due to the mere existence of the Crossing during the twenty year term of the Agreement, with no hint that this Crossing must already have the upgrades contemplated by the parties." (Railroad Defs. Mem. Opp. Mot. Dismiss at 13.) We are not persuaded. First, this argument ignores the inclusion of the phrase "and related facilities" following mention of the Crossing. Second, use of the words "construction" and "existence" at the very least implies installation has commenced.

Moreover, absent installation of active warning devices at a known dangerous railroad crossing leads the Court to question whether Metro-North could be considered to have provided any consideration for PCC's indemnification of the railroad defendants. It would be totally illogical for PCC to indemnify the railroad defendants for any damages arising out of the "construction, existence, [or] maintenance . . . of the Crossing and related facilities" *before* the construction of the safety facilities has even begun. Accordingly, the railroad defendants' cross-claim based on contractual indemnification is dismissed.

### B. <u>Common Law Indemnification</u>

However, the railroad defendants' cross-claim rooted in common law indemnification must survive. Plaintiffs in this action have brought negligence claims against both the railroad defendants and PCC. Under New York law, "common-law indemnity is barred altogether where the party seeking indemnification was itself at fault, and both tortfeasors violated the same duty to the plaintiff

. . . ." *Monaghan v. SZS 33 Assocs., L.P.*, 73 F.3d 1276, 1284-85 (2d Cir. 1996) (citing *Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 484 N.E.2d 1354, 494 N.Y.S.2d 851 (1985); *see Travelers Indem. Co. v. AMR Servs. Corp.*, 921 F. Supp. 176, 184 (S.D.N.Y. 1996) ("'[A] party which had itself actually participated to some degree in the wrongdoing cannot receive the benefit of the doctrine.'" (quoting *Trs. of Columbia Univ. v. Mitchell/Giurgola Assocs.*, 109 A.D.2d 449, 454, 492 N.Y.S.2d 371, 375 (1st Dep't 1985))). At this stage of the proceedings, the Court cannot determine liability among the parties, thereby precluding dismissal of the railroad defendants' cross-claim against PCC.

## CONCLUSION

For all of the foregoing reasons, the motion of Pirate Canoe Club, Inc. to dismiss the cross-claims of defendants National Railroad Passenger Corporation, Metro-North Commuter Railroad and Consolidated Railroad Corporation is granted with respect to contractual indemnity but denied with respect to common law indemnity.

SO ORDERED.

Dated: White Plains, New York
       June 28, 2006

*[signature]*
Sr. United States District Judge